## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Union Pacific Railroad Company,

                             Plaintiff,

                                      Civ. No. 05-334 (RHK/AJB)

                                      **MEMORANDUM OPINION**

                                      **AND ORDER**

v.

State Farm Fire and Casualty Company,

                             Defendant.

Michael O. Freeman & Christopher R. Grote, Lindquist & Vennum P.L.L.P., Minneapolis, MN, for Plaintiff.

Thomas A. Gilligan, Jr. & Christopher G. Angell, Murnane Brandt, St. Paul, MN, for Defendant.

### Introduction

       Plaintiff Union Pacific Railroad Company ("Union Pacific") has sued Defendant State Farm Fire and Casualty Company ("State Farm") to recover for the loss of one of its railroad trestles in a fire set by two insureds under a State Farm homeowner's insurance policy. The parties have filed cross-motions for summary judgment. For the reasons set forth below, the Court will grant State Farm's Motion and deny Union Pacific's Motion.

### Background

       This is an insurance coverage dispute arising from a grass fire set by Matthew

Dorweiler ("Matthew") who was assisted by his brother Nathan Dorweiler ("Nathan") on

April 8, 2000 (the "Fire").  At that time, Matthew and Nathan were living in their parents'

(Robert and Betty Lou Dorweiler) home at 1314 Greenleaf Road, Faribault, Minnesota.

(Trial Tr.[1] at 107-108.)  On April 8, 2000, the brothers left their parents' home and traveled

approximately fifty-five miles to a large grassy area in Plymouth, Minnesota.[2]  Railroad

tracks traversed the site in an east-west direction, and approximately 600 feet of these

tracks were situated on a wooden trestle (the "Trestle") spanning a swamp.  The trestle was

owned by Union Pacific.  (Gilligan Aff. Ex. G.)  There were grassy areas to the north and

south of the Trestle.  (N. Dorweiler Dep. Tr. at 18.)

Once at the site, Matthew parked the car at the east end of the site and both Matthew

and Nathan walked towards the Trestle.  (Id. at 16; Trial Tr. at 109.)  Matthew then walked

across the Trestle in a westerly direction, carrying one-half of a roadside emergency flare

devise (or "fusee").  (Trial Tr. at 109.)  Nathan did not cross the Trestle with Matthew; he

had stopped at the eastern end of the Trestle and eventually returned to the car.  (Trial Tr. at

109, 131-32; N. Dorweiler Dep. Tr. at 16-17.)  After crossing the Trestle, Matthew lit the

fusee and attempted to light a grassy area on the south side of the Trestle on fire.  (Trial Tr.

at 110-11, 132-33.)  Unsure whether his attempt to start a fire on the south side of the

trestle was successful, he threw the still-lit fusee approximately ten to sixty feet (Trial Tr.

---

[1]References to the transcript of the underlying state court trial related to this matter
(see infra at 7-8) will be to "Trial Tr."

[2]Specifically, this area was near 1300 North Medicine Lake Road and South Shore
Drive in Plymouth.  (Trial Tr. at 109.)

at 69-72, 110-11 (conflicting testimony regarding the distance the fusee was thrown)) to

the north side of the Trestle, which at that time was downwind of the Trestle.  Matthew

testified:

> Q: And you threw that flare in a northerly direction; correct?
> A: Correct.
> Q: And before that, did you do anything on the south side of the railroad
> bridge with that flare prior to throwing it in a northerly direction?
> A: I reached on the south side, I was not sure if it lit, so I threw it on the north
> side.
> Q: So you're not sure if it lit on the south side?
> A: Correct.
> Q: Where was the wind blowing in that day, sir?
> A: Blowing [from the] south.
> Q: And so you—in essence, when you threw the flare, you threw it with the
> wind?
> A: Correct.

(Trial Tr. at 110-11.)  After lighting the Fire, Matthew headed west, where he was picked up

by Nathan in the car.  The two then left the scene and went shopping.[3]  (Id. at 111-12.)

The Fire was discovered that afternoon and authorities (including several fire

---

[3]At the time of the Fire, Matthew was twenty years old, and Nathan was twenty-four years old.  (Gilligan Aff. Ex. D.)  Both Matthew and Nathan have a history of starting fires that began as early as 1991 or 1992, when they set fire to an abandoned house.  This behavior continued with the lighting of many grass fires over the years.  In one instance, on August 8, 1998, Matthew was severely burned as a result of a brush fire that he set behind his house.  (Trial Tr. at 99-100.)  He had used gasoline to set that fire.  (Id.)  Before arriving at the site of the Fire at issue here, Nathan started another grass fire.  On their way to the site, Matthew let Nathan out of the car next to a grassy area in Golden Valley, Minnesota.  (M. Dorweiler Dep. Tr. at 67-68.)  Nathan walked toward a nearby radio tower and, using a lighter, set fire to grass and brush.  (N. Dorweiler Dep. Tr. at 12.)  Immediately after lighting that fire, Nathan got back in the car with Matthew, left the scene, and proceeded to Plymouth.  (Id. at 13.)  By the time of the Fire, Matthew and Nathan were suspected of arson in connection with approximately sixty other fires.  (Gilligan Aff. Exs. B, C.)

departments) were immediately dispatched to the scene.  (Gilligan Aff. Ex. H.)  By the time

the authorities arrived, the Trestle was fully engulfed in flames.  (Id.)  It took approximately

six hours to extinguish the Fire.  (Id.)  The Trestle was completely destroyed as a result of

the Fire.  (Gilligan Aff. Ex. I.)  Evidence indicates that the cost to replace the Trestle was

$1,281,071.84.  (Trial Tr. at 219-20.)

      Matthew testified that he did not intend to burn the Trestle when he ignited the Fire.

Specifically, he testified:

> Q: And were you concerned?
> A: Well, we were because the railroad bridge got burnt down and our
> intention was not to burn the railroad bridge down.  The wind shifted and
> burnt the railroad bridge down and . . .
> Q: So when you set the fire, you didn't intend to burn - -
> A: No, our intention was not to burn the railroad bridge down, to burn the
> weeds on the other side of the railroad bridge.  The wind shifted, burnt the
> railroad bridge, and caught the other side of the weeds.  And our intention was
> not to burn the bridge in the fire at all.
> Q: So when you threw the flare, your intention was to burn - -
> A: Weeds.
> Q: - - the weeds and grass?
> A: And that's it.  Nothing else.
> Q: Okay.
> A: I want to make that clear, it was nothing else.

(M. Dorweiler Dep. Tr. at 76-7.)

He also testified:

> Q: Okay.  Why did you set the fire in the grass that we just talked about on
> April 8th?
> A: Don't know.
> Q: Now, did you try to set the railroad tressel bridge on fire?
> A: No, that was not my intention to burn the train tressel down at all.  My
> intentions were never to burn nothing down.
> Q: I'm sorry, I didn't - -

4

A: My intention was not to burn the railroad bridge down. Our intention was never to burn anything down.

Q: And what - - your intention was to burn grass though?

A: Correct, that's the only thing we intended to burn was the grass.

Q: And you knew when you threw a flare, a burning flare in the grass, it would burn?

A: Correct.

Q: Why didn't you want to burn the railroad bridge down?

A: That was not our intention. We don't intend to do damage like that. Just burn the grass, that's all we intended to do.

Q: Why do you burn grass?

A: Don't know, just do it.

(Trial Tr. at 112-13.)

On April 18, 2000, Matthew and Nathan were arrested at their parents' home. Because the Fire was set in a federal wildlife area and the Trestle was used in interstate commerce, the criminal case was turned over to the federal government's Alcohol, Tobacco, and Firearms Department. (Gilligan Aff. Ex. J.) Matthew and Nathan were indicted and charged with conspiracy to commit arson in violation of 18 U.S.C. § 844.[4] On

---

[4]18 U.S.C. § 844 reads in relevant part:

(f)(1) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any . . . real property in whole or in part owned or possessed by, or leased to, the United States . . . shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both.

(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any . . . real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both.

18 U.S.C. § 844 (f), (i).

August 30, 2001, Matthew and Nathan, both of whom were represented by counsel, each plead guilty, in this Court, to conspiracy to commit arson.  (Id. Ex. C at 21, 43.)  Both admitted to knowingly and intentionally conspiring to set the Fire.[5]  (Id.)  As part of their sentences, Matthew and Nathan were ordered to pay restitution to Union Pacific in the amount of $1,200,000.00.  (Trial Tr. at 146.)

A State Farm homeowner's policy was in effect on the date of the Fire on the home owned by Matthew and Nathan's parents, Robert and Betty Lou (the "Policy").  The personal liability portion of the Policy provides:

> If a claim is made or a suit is brought against an insured for damages because
> of bodily injury or property damage to which this coverage applies, caused by
> the occurrence, we will:
> 1. pay up to our limit of liability for the damages for which the insured is
> legally liable; and
> 2. provide a defense at our expense by counsel of our choice.

(Policy at 15.)  Occurrence is defined by the Policy as

> an accident, including exposure to conditions, which results in:
> a. bodily injury; or
> b. property damage.

(Id. at 2.)

The Policy also contains the following exclusion from the personal liability coverage:

> [Coverage does] not apply to:
> a. bodily injury or property damage

---

[5]They each also pleaded guilty to setting three other grass fires in April 2000.
(Gilligan Aff. Ex. C at 22-24, 43-45.)

(1) which is either expected or intended by the insured [(the "intentional act exclusion")]; or

(2) which is the result of willful and malicious acts of the insured [(the "willful and malicious acts exclusion")].

(Id. at 16.)

On January 11, 2001, Union Pacific sent Robert and Betty Lou Dorweiler a subrogation notice, seeking reimbursement for the loss, and recommending that they contact their insurer if they had liability insurance. (Freeman Aff. Ex. F.)

In September 2001, State Farm completed a "coverage evaluation" with respect to the Fire and the coverage obligations related thereto. (Freeman Aff. Ex. G.) Pursuant to an analysis of the facts and circumstances surrounding the Fire, State Farm determined that liability coverage under the Policy was not available to Matthew and Nathan with respect to any claims arising from the Fire because the "property damage [did] not meet the definition of occurrence and was caused by the intentional, willful and malicious acts of the insured." (Id.) It concluded that Matthew and Nathan's "actions cannot in any light be construed as accidental" and that "the nature of their actions is such that intent to cause property damage can be inferred as a matter of law." (Id.) State Farm also determined that it had a duty to defend Robert and Betty Lou Dorweiler, and did so under a reservation of rights. (Id.; see also Gilligan Aff. Ex. R.)

On October 10, 2001, Union Pacific filed a lawsuit in Minnesota state court against Matthew, Nathan, Robert, and Betty Lou Dorweiler, seeking to recover for the damage to the Trestle (the "Underlying Action"). (Gilligan Aff. Ex. B.) The complaint asserted two

counts of negligence: one against Matthew and Nathan for setting the Fire, and another

against their parents for breaching an alleged duty to protect the public from their children.

(Id. ¶¶ 11-14, 16-22.)  Pursuant to its earlier coverage evaluation, State Farm refused to

provide a defense to Matthew and Nathan, but did provide a defense to Robert and Betty

Lou Dorweiler.

Prior to the trial of the Underlying Action, Union Pacific and Matthew, through their

respective attorneys, entered into a Settlement Agreement, Release, and Covenant Not to

Sue ("Matthew's Settlement Agreement").  Under this Agreement, the parties agreed to

settle Union Pacific's demand against Matthew for the sum of $750,000.  (Freeman Aff.

Ex. L.)  Union Pacific agreed not to seek this sum against Matthew personally but rather

would seek it solely from State Farm.  (Id.)

A jury trial in the Underlying Action was held in April 2004.  Matthew testified but

Nathan did not.  At the close of evidence, and before the case was submitted to the jury, the

trial judge determined, as a matter of law, that both Matthew and Nathan were negligent and

that their negligence caused the Fire.[6]  (Trial Tr. at 274-75.)  The jury then found that

Robert and Betty Lou Dorweiler were not negligent in the supervision of their sons.

(Freeman Aff. Ex. D.)  The jury also found that Matthew and Nathan were each 50%

responsible for the burning of the Trestle and found that the damage suffered by Union

_____

[6]The complaint in the Underlying Action alleged only a claim of negligence against
Matthew and Nathan; Union Pacific did not allege any intentional tort claims in the
Underlying Action.  (See Freeman Aff. Ex. O.)

Pacific amounted to $1,281,071.84.  (Id.)

On December 17, 2004, Nathan executed an assignment with Union Pacific wherein he assigned his rights to sue State Farm to Union Pacific, and Union Pacific agreed to seek damages only against State Farm and not against Nathan ("Nathan's Settlement Agreement").  (Freeman Aff. Ex. M.)

Union Pacific sent a demand to State Farm for payment of the amount of the jury verdict against Matthew and Nathan.  State Farm reiterated its refusal to defend or indemnify the brothers.  Union Pacific initiated the present action in state court and State Farm removed it to this Court on diversity grounds.  Cross-motions for summary judgment are now before the Court.

## Standard of Decision

Summary judgment is proper if, drawing all reasonable inferences favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The

nonmoving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995).

## Analysis

State Farm argues that it has no duty to defend or indemnify Nathan or Matthew

because the Fire was not an "occurrence" as that term is defined in the coverage provision,

and that Matthew's and Nathan's actions are subject to the intentional act exclusion and the

willful and malicious acts exclusion of the Policy.  Because either of the relevant

exclusions may operate to exclude the Fire from coverage under the Policy, the Court will

move directly to a consideration of the exclusions.

**A.      Intentional Act Exclusion**

The Policy contains an exclusion from coverage for property damage "which is

either expected or intended by the insured."  (Policy at 16.)  The Court will consider the

application of the intentional act exclusion to the facts presented in the instant action.

**1.      The Applicable Law**

Intentional act exclusions have been subject to extensive analysis under Minnesota

law—there are numerous decisions that deal with, interpret, and apply such exclusions.

See, e.g., American Family Ins. Co. v. Walser, 628 N.W.2d 605, 613-615 (Minn. 2001)

(discussing cases).  For purposes of an intentional act exclusion, "the necessary intent may

be established either by [1] proving an insured's actual intent to injure or by [2] inferring

10

such intent as a matter of law." R.W. v. T.F., 528 N.W.2d 869, 872 (Minn. 1995) (citation omitted).  The determination of the insured's actual intent does not necessarily control, as "the purpose of intentional act exclusions is to exclude insurance coverage for wanton and malicious acts by an insured, and therefore [the Court] may, absent a finding of specific intent to injure, infer intent to injure as a matter of law." Walser, 628 N.W.2d at 613 (citation omitted); R.W., 528 N.W.2d at 872; see also Farmers Ins. Exchange v. Sipple, 255 N.W.2d 373, 375 (Minn. 1977) ("The purpose of an 'intentional acts' exclusion is to prevent extending to the insured a license to commit wanton and malicious acts.").

State Farm argues that "irrespective of whether Matthew and Nathan specifically intended to burn the trestle, . . . their criminal act of deliberately setting fire to dry grass in close proximity to a wooden railroad trestle on a windy day is such that intent to damage the trestle is inferred as a matter of law." (State Farm Mem. in Opp'n at 13.)  Union Pacific counters that intent is only inferred in "'extreme' cases involving violent physical assaults such as shootings and physical assaults involving sexual contact." (Union Pacific Mem. in Opp'n at 14.)

"The determination to infer intent as a matter of law results from a case by case factual inquiry, not a bright line rule of law.  More specifically, the facts of particular importance are those tending to show the likelihood of the harm—the greater the likelihood of the harm occurring, the more reasonable it is to infer intent." R.W., 528 N.W. 2d at 873.  Such a determination is "based on the circumstances and nature of the insured's actions." Walser, 628 N.W.2d at 613.  Intent may be inferred as a matter of law

for purposes of an intentional act exclusion where the character of the insured's acts are factually "extreme."  See Walser, 628 N.W.2d at 613.

For example, intent has been inferred as a matter of law where the insured was involved in shooting at a truck with knowledge that it was occupied, resulting in injury to the occupant, despite the insured's insistence that he did not mean to injure anyone.  Woida v. North Star Mut. Ins. Co., 306 N.W.2d 570, 572-74 (Minn. 1981).  In Toal v. Erickson, 244 N.W.2d 121, 123, 125-26 (Minn. 1976), intent was inferred where the insured was involved in an armed robbery resulting in the death of a store clerk, again despite the insured's testimony that he did not intend to injure anyone during the robbery.  Intent was also inferred in R.W., 528 N.W.2d at 873, where the insured transmitted herpes to the plaintiff during consensual sex when he knew or should have known that he was infected himself.  And intent was inferred in Fireman's Fund Ins. Co. v. Hill, 314 N.W.2d 834, 835 (Minn. 1982), a case in which the insured had sexual contact with a minor foster child placed in his home.

In considering this line of cases, the Minnesota Supreme Court concluded that intent has been inferred where

the insureds acted in a manner in which they knew or should have known that some harm was substantially certain to result; that is, they acted with deliberate and calculated indifference to the risk of injury.

Walser, 628 N.W.2d at 614 (citations omitted).  Therefore, in order to infer intent as a matter of law, Matthew and Nathan must have "acted with deliberate and calculated indifference to the risk of injury to [the Trestle]."  Id.  The Court will consider the above

12

principles as applied to Matthew and Nathan individually.

### 2.    Application of the Exclusion to Matthew's Actions

With respect to Matthew, the evidence shows that he "acted with deliberate indifference to the risk of injury" to the Trestle. Id. at 614. Matthew clearly intended to start the Fire on April 8, 2001. (Trial Tr. at 109-13.) When he threw the burning fusee into the grass, he knew that it would burn. (Id. at 113.) Although he testified that he only intended to burn the grass around the Trestle, he also knew if the wind shifted, the Fire could burn the Trestle (id. at 133), the wind conditions that day were such that the Fire could proceed in any direction, (id. at 134), the Fire could be large (id.), and there was a danger to people (including himself) and property posed by the Fire (id.).

Matthew had set grass and brush fires before, and in fact, had been severely injured by a fire he set in 1998. (Trial Tr. at 99-100.) He knew of the potential for fires to get out of control. Matthew knew at the time he set the Fire that it was wrong and against the law. (Id. at 136.) Furthermore, while he testified that he threw the fusee ten to twenty feet downwind from the Trestle (id. at 133), he also attempted to light grass upwind from the Trestle (id. at 110-11), which casts serious doubt onto any efforts he may have made to avoid burning the Trestle based on the direction of the wind.

This is "not a case . . . where an impulsive albeit intentional, act results in an unintended injury." Toal, 244 N.W.2d at 126. This is a case in which an individual with an extensive history of setting illegal fires, and a clear understanding of the danger and scope of such acts, intentionally chose a dry windy day to set a grass fire ten to sixty feet away

from the wooden Trestle.  Matthew had the intent to damage property when he set the Fire

on April 8, 2000, and the fact that this damage extended to a structure worth a great deal of

money, rather than only affecting the land itself at the federal wildlife area, does not negate

his intent as a general matter.  It is important to note, that "if an intent to inflict injury is

found, the exclusion applies regardless of whether the actual injury is more severe or of a

different nature than the injury intended."  Woida, 306 N.W.2d 573 (citation omitted).

Accordingly, the Court determines that Matthew's intent can be inferred as a matter of law

so as to bring his actions within the intentional act exclusion of the Policy.

### 3. Application of the Exclusion to Nathan's Actions

Most of these considerations apply to Nathan as well.  While Nathan did not actually

light the Fire, he testified that he and Matthew picked the general area for the fires they set

that day because the grass was long and dry, it was a windy day, and the area was marshy like

the areas in which he had previously lit fires.  (N. Dorweiler Dep. Tr. at 31-2, 35.)  He also

knew that the conditions were right on April 8, 2000, for the Fire to be expansive.  (Id. at

41.)  Nathan also had an extensive history of setting illegal grass fires and had Matthew stop

the car on their way to the site of the Fire at issue here so that he could start a grass fire at

another site.  (Id. at 37.)

Nathan and Matthew together had purchased the fusee that Matthew used to start the

Fire a few days before April 8, 2000.  (Id. at 32-3.)  Nathan knew that Matthew was going to

start the Fire, and the two made a plan that involved Matthew starting the fire while Nathan

drove the car around to pick him up.  (Id. at 42.)  When Matthew got out of the car to light

14

the Fire, Nathan got out with him and walked with him to a point.  Nathan then went back to

the car and picked Matthew up as they had planned.  (Id.)

       The facts and circumstances of Nathan's conduct here are similar to those that have

been held sufficient for inferring intent for purposes of an intentional act exclusion under

Minnesota law.  See Woida, 306 N.W.2d at 573-74; Toal, 244 N.W.2d at 125-26.  In the

context of personal or bodily injury[7], where there is some planning and knowledge of the

circumstances leading to injury, that the insured himself may not have actually pulled the

trigger (or, in this case, lit the fusee) does not preclude a determination that intent should

be inferred as a matter of law.

       In Toal, a case involving an armed robbery in which a store clerk was shot and killed,

neither of the insureds actually pulled the trigger.  244 N.W.2d at 123.  Rather, the insureds

in that case participated in the robbery, but only as accomplices with respect to the

shooting.  Id.  The Minnesota Supreme Court determined (as mentioned above) that there

was no insurance coverage for the actions of the insureds because those actions were

subject to an exclusion for injuries "expected or intended" by the insured.  Id. at 123.  The

court "noted that if there is an intention to injure, the exclusion applies regardless of

whether the actual injury inflicted is more severe or even of a different nature than the

injury intended."[8]  Id. at 126 n.4.  Despite the fact that neither of the insureds "specifically

_____

     [7]See infra pp. 17-20.

     [8]At oral argument, Union Pacific repeatedly urged that Toal was favorable to its
claims and referred the Court to footnote 2 of that decision.  244 N.W.2d at 125, n.2.  In
footnote 2, the Minnesota Supreme Court stated, in the context of determining that an

intend[ed] to shoot anyone during the robbery," the court inferred intent for purposes of an

intentional act exclusion based on the planning, involvement, and knowledge of the insureds

"that someone might well be injured or killed in the process" of the robbery.[9]  Id. at 123,

125-26.  Accordingly, the Court determines that Nathan's actions fall under the intentional

act exclusion as well.

### 4.      The "Extreme" Nature of the Conduct

Despite the nature of Matthew and Nathan's actions, Union Pacific argues that the

facts of this case are not sufficiently extreme for an inference of intent to apply.  (State

_____

insured cannot be presumed to intend the natural and probable consequences of his actions
for purposes of an intentional act exclusion,

> it has been held that the intentional injury exclusion does not apply, for
> example: Where the insured intentionally fires at one individual but
> unintentionally wounds the plaintiff; [and] where the insured intentionally
> throws a lighted firecracker into a room with the plaintiff inside but intending
> only to frighten the plaintiff . . . .

Id. (citations omitted).  The court cited cases from other jurisdictions in noting those
holdings.  Id.  What Union Pacific fails to acknowledge, however, is that the court in Toal
went on to determine that, based on the character of the insureds' actions in that case, intent
to injure could be inferred as a matter of law.  Id. at 125-26.  It held as much despite the
fact that the insureds did not shoot the victim (whose injuries were the subject of the
claim).  Id.  This is a wholly separate issue from the court's determination that intent may
not be presumed based solely on the forseeablility of an injury arising from the insured's
intentional act.

[9]Further support can be found in Woida, a case involving a group of men shooting at
a truck they knew to be occupied and ultimately injuring one of the occupants.  There, the
evidence did not necessarily indicate that the insured himself fired any of the shots leading
to the injury.  306 N.W.2d at 572 (insured was seated in the front of the shooting vehicle,
but testimony indicated that the shots came from the back of the vehicle); but see Walser,
628 N.W.2d at 614 (interpreting facts of Woida such that the insured actually fired at the
truck).  However, because the insured was involved in the plans leading up to the shooting,
and generally with the group of men that did the shooting, it was the group's actions that the
court looked to in inferring intent.  Id. at 573-74.

Farm Mem. in Opp'n at 14-18.)  According to Union Pacific, the only cases in which intent may be inferred for purposes of a policy exclusion "are cases of breathtaking cruelty."[10] (Id. at 14.)  However the Minnesota Supreme Court has declined to set such a high standard in stating that cases in which intent may be inferred are generally "factually more extreme." Walser, 628 N.W.2d at 613.

Rather, in Walser, the court noted that "[t]here is no bright line rule as to when a court should infer intent to injure as a matter of law."  Id.  It further noted that intent had not been inferred in cases in which (1) the insured struck a baggage clerk after an argument and tug-of-war over a piece of luggage; (2) the insured pushed a hat-check girl causing her injury; or (3) the insured injured a friend by throwing an explosive device when the insured had exploded such a device in the past without injuries and the insured threw the device away from bystanders.  Id. (citing Brown v. State Auto. & Cas. Underwriters, 293 N.W.2d 822, 823-25 (Minn. 1980); Casperson v. Webber, 213 N.W.2d 327, 330 (Minn. 1973); and German Mut. Ins. Co. v. Yeager, 554 N.W.2d 116, 118 (Minn. Ct. App. 1996), respectively).  These cases stand in contrast to the cases in which intent has been inferred; cases in which intent is inferred, as discussed above, have involved guns, assault, and sexual misconduct.  Id. at 614 (citing and discussing cases).

In addressing Union Pacific's argument, the Court must first note the obvious difference between this case and the cases discussed above: this case deals solely with

_____

[10]It is worth noting that by using the term "cruelty," Union Pacific attempts to limit the applicable situations to those involving injuries to persons.

17

property damage—there are no claims for bodily injury.[11]  The cases discussed above

universally deal with bodily injuries of varying degrees and distances from the intentional

acts at issue.  Thus, the acts of Matthew and Nathan must be analyzed in the context

presented by the consequences of their actions—actions which resulted in property damage

only.

       In the Court's view, and contrary to Union Pacific's argument, this context lends

further support to the conclusion that intent must be inferred as a matter of law in the

instant action.  Whether the actions of Matthew and Nathan were sufficiently extreme to

infer an intent to cause <u>bodily injury</u> is not at issue here.  Rather, the Court is asked only to

infer intent to cause injury to something (property) that was already the subject of violent

acts (arson) on the part of Matthew and Nathan.  Thus, the inference must only extend from

the intent to harm the grass and land of the wildlife reserve, to the harm suffered by the

trestle.

       In cases involving bodily injury where intent to injure has not been inferred, the facts

were either much less extreme than those at issue here (pushing or shoving an individual) or

they require the inference to extend much "farther" in order for it to "reach" a severe bodily

injury.  For example, in <u>Yeager</u>, the Minnesota Court of Appeals held that the insured's act

of throwing an explosive device that severely injured his friend was not excluded under an

intentional act exclusion.  554 N.W.2d at 118.  While there are a number of potentially

_____

     [11]The exclusions in the Policy explicitly apply to "bodily injury <u>or</u> property damage."
(Policy at 16 (emphasis added).)

relevant factual distinctions between these two cases[12], perhaps the most relevant is that the

act at issue in <u>Yeager</u> led to severe bodily injury—a harm not at all contemplated by the

insured, whereas the arson at issue here led only to property damage—the type of damage

that was contemplated by the insureds.  The Court, therefore, determines that the actions of

Matthew and Nathan were sufficiently extreme to infer intent to cause damage to the trestle

as a matter of law.  Accordingly, the intentional act exclusion operates to exclude the

actions of Matthew and Nathan from coverage under the Policy.

**B.      Willful and Malicious Acts Exclusion**

The Policy also excludes property damage "which is the result of willful and

malicious acts of the insured."  (Policy at 16.)  There appears to be much less authority

interpreting willful and malicious acts exclusions, but the authority that does exist counsels

in favor of the application of the exclusion to the facts of this case.

The Minnesota Court of Appeals considered the application of a willful and

malicious act exclusion in <u>State Farm Fire & Cas. Co. v. Neises</u>, 598 N.W.2d 709 (Minn.

Ct. App. 1999).  In that case, the court held that the insured's acts of grave robbing and

corpse mutilation were excluded under the willful and malicious act exclusion of the policy

at issue.  <u>Id.</u> at 712.  In so holding, the court noted that the insured knew "[w]hat he did was

wrong and unlawful," and the fact that he "acted out of morbid curiosity rather than from a

---

[12]For example, in <u>Yeager</u>, the insured had exploded such a device in the past without injuries, 554 N.W.2d at 118, whereas in this case, the insureds had set fires that led to bodily injury and the destruction of property in the past.

desire to harm does not mean that his act was not willful or malicious." Id.  It further noted that applying the willful and malicious acts exclusion to the actions of the insured was consistent with the edict that "policy language is to be construed in accordance with the reasonable expectations of the insured." Id. (quoting American Family Mut. Ins. Co. v. Peterson, 405 N.W.2d 418, 422 (Minn. 1987)).  It was not "a reasonable expectation for purchasers of the insurance policy at issue" that they would have coverage for liability resulting from "grave robbing and corpse mutilation." Id. at 713.

Here too, as discussed in more detail above (see supra pp. 13-15), Matthew and Nathan were well aware that their actions in setting the Fire were "wrong and unlawful," despite their testimony that they did not intend to damage the Trestle.  Neises, 598 N.W.2d at 712.  They acted with vast first-hand knowledge of the potential personal and property damage that could result from grass fires; they had a history of setting fires and knew the conditions were right for the Fire at issue here to get out of control.  Nor can the Court determine it likely that coverage for liability resulting from arson is a reasonable expectation for purchasers of the insurance policy at issue. Id. at 713.

That the acts of arson are within the willful and malicious acts exclusion is supported by the reasoning of State Farm Fire & Cas. Co. v. Martin, 710 N.E.2d 1228 (Ill. 1999). In Martin, the Supreme Court of Illinois held that the actions of the insured building owner, who hired a tenant to set fire to his building, were subject to a willful and malicious

acts exclusion and thus not covered under his insurance policy.[13]  Id. at 1233.  There, the

court noted that "an assessment of [the willful and malicious acts] exclusion's applicability

requires a focus upon the acts of the insured-not upon the injuries of the tort plaintiffs."[14]

Id. (emphasis in original).  The court concluded that the insured's acts were intentional and

willful, and that the insured was convicted of "maliciously damaging and destroying his

building by means of a fire," and thus held the exclusion applied to deny him coverage.  Id.

(citations omitted).

 The Court determines that a focus on the acts of Matthew and Nathan in this case

likewise leads to the conclusion that the willful and malicious acts exclusion applies to

their actions and excludes coverage under the Policy.  As discussed above, both insureds

knew of the potential for serious harm and acted nonetheless.  Furthermore, both insureds

pled guilty to conspiracy to commit arson.[15]  Accordingly, the Court determines that the

actions of Matthew and Nathan are also excluded under the willful and malicious acts

exclusion.

## C. Duty to Defend

---

[13]In Martin, the fire set by the insured led to the death of two responding firemen.
710 N.E.2d at 1229-30.

[14]The wording of the willful and malicious acts exclusion at issue in Martin is the
same as the wording of the exclusion at issue here in every relevant respect.  710 N.E.2d at
1233 (noting that the language of the policy "excludes coverage for injuries which are . . .
'the result of willful and malicious acts of an insured'").

[15]The Court notes that Matthew and Nathan were charged with "maliciously"
damaging or destroying property "by means of fire or an explosive."  See 18 U.S.C. § 844
(f)(1), (I) (emphasis added); see also supra n.4.

Union Pacific also argues that State Farm had a duty to defend Matthew and Nathan in the Underlying Action.  (Union Pacific Mem. in Supp. at 17-19.)  However, since the Court has determined that the actions of Matthew and Nathan were not covered by the Policy, the duty to defend question is no longer open.  See Woida, 306 N.W.2d at 574. "When it can be concluded as a matter of law that there is no basis upon which an insurer may be obligated to indemnify the insured, the insurer is relieved of its duty to defend."  Id. (citations omitted).  State Farm, therefore, owes no duty to defend Matthew and Nathan, as coverage had been declared excluded.[16]  Id.; see also Toal, 244 N.W.2d at 126, n.5 ("[S]ince we have determined that the injury caused by insureds was excluded under their insurance policies, the insurers did not erroneously deny their obligation to defend insureds.")

## CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein **IT IS ORDERED** that State Farm's Motion for Summary Judgment (Doc. No. 12) is **GRANTED** and Union Pacific's Motion for Summary Judgment (Doc. No. 18) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: January  13  , 2006

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

---

[16]Likewise, the Court determines that Union Pacific's other claims—breach of contract, breach of fiduciary duty, and breach of duty of good faith and fair dealing—must fail due to the conclusion that Matthew's and Nathan's actions are not covered under the Policy.

22